We'll now turn to 24-2512 Industrial Tower and Wireless, LLC v. Roisman et al. Good morning, Your Honors. Good morning, Mr. Shapiro. I understand you are going all in, no rebuttal. Going all in, yes. All right. Well, let's hear it. Ten minutes is not a long time. So with that, if it pleases the Court, I'm Nicholas Shapiro, Phillips & Angley for Industrial Tower and Wireless, the plaintiff appellant in this case. We're nearly 30 years in with the TCA, and I would submit to the panel that this case exemplifies why Congress enacted it in the first place and why its protections remain so vital to this day. In this case, there's no genuine dispute of material fact that there's a significant gap in telecommunications wireless services for both my client, in terms of their SMR system, for national carriers, as well as the St. Albans Police Department. There's likewise no genuine dispute of material fact, unlike a lot of TCA cases where applicants lose, that my client engaged in a fulsome due diligence search and that this is the only feasible and least intrusive site to install a tower to fill the gap for everyone. There's terrain here that's pretty idiosyncratic in that there's a pretty drastic ascension and grade to the west that makes the west largely not visible in relation to this tower. There's likewise no genuine dispute of material fact that 140 feet of tower height is the minimum necessary to plausibly fill the coverage gaps for all six actors that need telecom services. This is an area of northern Vermont near the Canadian border in which there are very few only Verizon and AT&T are in facilities within 10 miles of LOCUS. DISH and T-Mobile, this would be them being able to come into the area in the first place. There's no genuine dispute of material fact that the PUC in this matter didn't provide a CPG, a certificate of public good, at the 120 foot iteration of a tower. Was an application to approve the 120 foot height tower ever made? I didn't think there was one that was pending. I thought they saw this as the least restrictive alternative that would satisfy the coverage gap needs and there's some ambiguity about whether they would approve it, but it was suggested that they would. But there was no pending application, was there? That is true. That's absolutely correct, Your Honor. However, in the case law, if a citing authority comes into court and says, there's this least intrusive means that could fill it, generally speaking, courts actually expect some quantum of evidence, not just if you file it after 17 months of proceedings, after a year or so before the district court. It's a little hard to charge them with it though, with having failed to approve something that wasn't submitted. Well, but this was, again, Your Honor, this was a 17 month process. There was a tremendous amount of that. I mean, and this is going to get into some of our claims of error in this case. But what I was first gesturing to, Your Honor, is more on the effective prohibition claim, right? Which is these claims are the, this court's test, significant gap in coverage, least intrusive means, is at least everywhere that's decided the question, which as this court has pointed out in White Plains, it hasn't been decided yet. But every single court in the country who's passing the question is, it's the provider perspective, carrier by carrier analysis. It's not the consumer perspective such that if there's some measure of coverage, then there's adequate coverage. And here it's Northern Vermont where there's not, it's stipulated that there's not good coverage. But the section that we're talking about is called preservation of local zoning authority. And the statute seems to work a, right, an accommodation between local interest and provider interest and consumers and providers. And there are different ways to read the limitation statute. So the effective prohibiting 120 foot tower that would allow for two providers might be adequate from one perspective. And it wouldn't get all your six up there in the area or allow a new entrant. So, but on the other hand, if there were 15, you know, national carriers, do they have to build it? You know, I have to be allowed to build a 200 foot tower to accommodate all 15. I don't think, I don't read the statute as requiring that. Well, it would be this court's test construing the statute and there aren't that many market actors and anybody in my client's position as a site development company, we'd still have our prima facie case we'd have to make. We'd have to do propagation studies and maps for all of the, whether it's four, whether it's seven, we'd have to show that there's a geographically, there's a gap in coverage in this precise location and that a tower in this location would fill that gap for everyone. And so the prima facie case itself, the elements of the cause of action is articulated by this court already is a delimiting principle. And so in this case, if it's carrier by carrier, there's no genuine dispute of material fact that 140 feet is the least amount plausibly again, because I mean, if all carriers are entitled to demand access, correct. And as a site development company who has equal protection under the statute, the private cause of action speaks of persons adversely affected. Suppose there were 15 national carriers, would you be automatically entitled to a 250 foot tower? Possibly, your Honor, but it depends on the facts. I mean, I can only argue what we have before us today. It was a hypothetical question. Sort. There, there is a set of facts, your Honor, where, where, where I would, where I would, yes, there could be a circumstance. There, there is in my experience, having represented my client for many, many years, we've internalized the cooperative federalism. When we, when we identify a gap in coverage, we go and we look at sites. We look at, at, at applicable state and local siting criteria. We know that we, that these, that cell towers are not liked by any community. It brings heat almost every single time we have to bring one of these applications. And so we routinely take, you know, do a diligent search, find the best possible place that's going to make the smallest impact on the community in order to provide coverage to an area. And that's precisely what we did here. And 140 feet, your Honor, is actually not even, it's even marginal for the, to be honest with you, it's marginal for the fourth national carrier because it's below 100 feet. But, but we do agree that 120 foot tower, as the court seemed to find, would allow access to two carriers. One to two, your Honor, because there would be one at 92.5 and an RF propagation starts dissipating once you're below certain levels, depending on where you are, tree cover in the area. So it would cover, from a consumer's perspective, it would cover a coverage gap. It would cure a coverage gap, but it wouldn't provide access to all the carriers and maybe a different economic position, proposition for your client as well. Correct. But so, and I would submit that under prevailing law, whether it's carrier by carrier, that that should be the end of the story. But there's other problems in this case, your Honor. One is that... You're saying every carrier needs to have access to cure their coverage. Correct. But of course it would be framed by the proposal being presented. If we were only asking for height for co-location for two of the carriers, then we wouldn't be able to say, oh, we get all four, right? If we come up with propagation studies and maps that show there's a gap in coverage for these people whom we want to serve, and that the post-bill propagations and maps show that it will be filled, then if we've identified the least intrusive means of doing that, under my understanding of the law throughout the country on these types of claims, we're entitled to our permits. And here, some of the problems, one of the reasons why this 120, 140, from my perspective, is a red herring, it's not just they didn't approve it, it's that from state statutory law, 248A, the siting statute that the PUC was operating under, to the regional plan, to the municipal plan, to Edosburg's actual zoning bylaw, all articulate a preference for co-location. That presents an obvious... In fact, to the point where if there's an existing tower, that's where carriers must go. What do you mean a preference for co-location? So all of these levels of law, Your Honor, require that if there's a facility to co-locate on, an existing facility, to go onto... You put them on there. Then you put them on there first, because of course, that minimizes visual impacts. So every single layer of Vermont law, and this goes to the legal review under Substantial Evidence Clause 2, is that there were legal errors that were committed in this case, in that every level of Vermont law values and shows a actually legally mandatory preference for co-location. But in this geographic location, there are no sites to co-locate on. But doesn't that presume that each of the carriers then has a right to demand a place to place a tower to broadcast from and to serve customers in that area, so that you're saying they would have to approve other sites to build towers on for the carriers that weren't accommodated by the 120-foot tower? What I'm saying is that saying that the 120 is the least intrusive means itself does violence, not just to the TCA, but to applicable state and local law, which says we need to have co-location sites. There are none here. If they were serious about their own law, they ought to have permitted this thing. Because once it is actually erected, carriers that are coming into the area to provide coverage have no other choice but to go on this tower. And so they're in effect saying... How many, let's say you built a 140-foot tower, how many national carriers would it accommodate? How many would I believe would come? No, would it accommodate? Let's... So to be completely accurate and frank, Your Honor, it is three to four. It's what? Three to four. Because the bottom rung, even at 140, this is what I'm saying about, we generally negotiate against ourselves because as a company, we know people hate these things. And we know there's aesthetic impacts are a big issue for everyone. So a 140-foot would do three to four and a 120 would do one to two. And with one to two, your argument is that there's still gaps. Correct. And I mean, under the effective prohibition clause. But again, there's a lot of... Sorry, Your Honor, I don't want to... What do you mean under the effective prohibition clause? So in this case, Your Honor, there's two claims that have been brought. The TCA has both procedural and substantive preemption of local land use decision-making. The procedural is, you know, you've got to have substantial evidence. There's got to be a written record. You've got to give reasons in that written record. Substantial evidence review imports the classic administrative, you know, judicial review of agency decision-making. So that's procedural preemption. We brought that claim that here, this didn't comport with basic principles of administrative review of agency. There wasn't substantial evidence. There was errors of law, even interpreting local law in this case that led to an outcome where we were denied a CPG. We also brought an effective prohibition clause claim, which that is substantive preemption. That is, it does not matter. I know there's a preservation of state and local authority, but when there's an effective prohibition of personal wireless service, those state and local laws are required to bow under the supremacy clause. I don't understand how you can call this an effective prohibition of personal wireless services if two providers can provide service in that area. So this gets the first claim of error, Your Honor, which would be dispositive in this case. Is it carrier by carrier? Or is it some service from some carriers is sufficient? But it's important to go back to the congressional record, the actual text of the acts, the FCC regulatory rulings, the 97 ruling, the shot clock ruling in 08, the 2018 ruling that actually has somewhat criticized the two-pronged tests for effective prohibitions in the circuit courts and has advocated for materially inhibit standard, is that what Congress intended while preserving local authority, making people like my clients submit to local authority. In what way? Pardon? In what way would you be submitting to local authority if you demand that you... We spent 17 months, Your Honor, and we had multiple rounds of pre-filed written testimony. There were three aesthetics experts. And this gets to the factual error on the second prong. Please, please, please read the 20-page aesthetic report of Mr. Perkins and read his live testimony. His testimony, it couldn't have been more conclusive, definitive, that from his perspective, there is no decrease in intrusiveness or obtrusiveness if you go from 140 to 120 in the discrete geographic area where there'd actually even be an adverse visual impact. There actually was a decrease in the visual impact area if you went from 140 to 120. Please, I can't stress this enough. Please read the report. It's one of the best pieces of expert opinion, anything, that I've seen in 15 years of being a land use lawyer. He goes through step-by-step that visibility and visual injury are distinguishable. And he explains why that's the case. And so just because something is visible in 3.1% or 2.5% of a 10-mile area, even in those places it's visible doesn't mean there's going to be a visual injury. And so there was a very discrete area to the east where there was going to be adverse visual impacts along Route State Highway 108 and that valley. Everywhere else, there wasn't even going to be. And he also went through, mind you, again, on legal error under substantial evidence review, he went through all of the questions that the Vermont Supreme Court had articulated under their Cuici standard for assessing a visual injury. But other than the first question, everything came out negative in terms of violating the state's standards for aesthetics. So this is a problem in this case, is that there actually, the 120 to 140, there isn't a difference in terms of visual impact. There is no intrusiveness or obtrusiveness, you know, benefit obtained from the community in going down to 120. And it violates both the TCA's purpose of the rapid deployment of telecom infrastructure through fostering a pro-competitive marketplace, which means it is the reason for the carrier by carrier, that we don't want monopolies of service providers. It's also why site development companies like my client get the protection of the Act, because market segmentation and division of labor ends up creating market efficiencies. So in this instance, there was just no, there was no substantial evidence. And everything, if you look at the PUC's reply briefing in support of their motion to dismiss, they admit that the PUC decided our application entirely on the NRCP's letter. And the NRCP didn't participate in the proceedings, didn't develop a record. If you look at that last letter from April 2023, it makes three discrete factual contentions, all of which are actually false on the record. Okay, I think, Mr. Shabir, I think we've kept you up a little longer, and we appreciate your argument. Why don't we hear now from Attorney Cain for the FLE. Good morning, Your Honors. Thank you very much, and may it please the Court. Ryan Cain on behalf of the members of the Vermont Public Utility Commission. This Court should affirm the District Court's decision because that Court applied the correct legal standard. That standard is deferential to the Public Utility Commission's decision and requires affirmance of that decision so long as it is supported by substantial evidence. Here there was substantial evidence that a lower tower, a 120-foot tower, would be less obtrusive while meeting the purposes of the application and therefore was non-compliant with the Regional Planning Commission's plan. And under Vermont law, the PUC owed deference to that decision. Has the agency committed to approving and issuing a CPG for a 120-foot tower? No, because again, they never asked for a 120-foot tower. Had they come back and said during that process, which isn't uncommon for an applicant to seek amendments that reflect feedback from either neighbors or towns throughout the process, because again, I think fundamentally this case turns on this balance that the TCA strikes. The purpose of 332C7 I think is clear, to maintain the authority of local and regional regulators to regulate. And it gives a carve-out to that only to the extent that the proposal is the least intrusive option. Well, the statute doesn't speak to the least intrusive option and there is this long history of there being carrier by carrier kind of consideration. And I'm concerned that if we adopt your view, we would in effect end up perpetuating a monopoly on services there that would allow the carriers to price however they want in a secluded section of the country. Why is that an ill-placed concern? I don't think it's an ill-placed concern. I think it's a concern that the Public Utility Commission and the District Court both acknowledged, recognized, and concluded that because the undisputed evidence showed that the 120-foot tower met both the purposes of ITW's own services and also opportunities for co-location of at least two national carriers, possibly more. Not more. I think they've said one to two. Isn't that right? But Mr. Delaney's testimony with respect to when asked on cross-examination, I believe, of placement in that even, you know, 82.5-foot level, which I think they've said is not, they're not counting that as the one or two. But he wasn't conclusive that that couldn't fill a gap. But fundamentally, I mean, I think this goes to the questioning before, a speculative application on behalf of a developer who's not one of those carriers, it leads to the opportunity where they get to decide what, quote-unquote, is plausible for potential future uses and then build for the maximum possibility for potential co-location, which I think undermines the clear purpose of the deference to local planning. But, and I think it's clear, it's not even plausible that there would be more than two carriers who would want to co-locate on this tower. And they acknowledge that Dish and T-Mobile have almost no presence within northeastern Vermont. And it's not in the least bit plausible that they would select the first opportunity to build that in Enosburg, a very tiny town and a six-mile stretch of Route 108. So you really do have only two national carriers who have a presence there. But fundamentally, also, this goes to the point of what co-location means. So if they constructed the 120-foot tower, they would have opportunity for one to two co-locations built into their design. But that doesn't necessarily foreclose the opportunity to co-locate further carriers down the road. Towers are often, these are modularly constructed. There's often additions onto them. There's additions. There's a lot of different ways that carriers are obligated to figure out how to co-locate on existing structures that have already been built. But that's not in this record. There's nothing about that in this record, is there? And I think this goes to the deferential standard of review here. What is in the record is substantial evidence, which is a relatively low burden to show. It's more than a scintilla, but less than preponderance, that a 120-foot tower would be less visually obtrusive, therefore comply with the regional plan and meet the purposes of both the ITW's own services and sort of the general state interests in providing opportunities for co-location of national personal wireless carriers. And it would close all the gaps? That's, it's completely speculative, I think, whether or not. They've said it's plausible that the 140-foot tower would ensure the ability to close gaps for four national carriers, even though those don't exist. But this, again, they say it has to be carrier by carrier, but they don't actually have any evidence establishing that, which carriers they're talking about and what those carriers need with respect to height at a particular point to close a particular coverage gap. We've stipulated, yes, there's a gap in coverage for pretty much everything in this stretch of, you know, rural northeastern Vermont. But that doesn't answer the question of whether or not the particular proposal is the least intrusive means. And I think, ultimately, the three arguments are kind of coextensive, are resolved by the conclusion that a shorter tower is less visually obtrusive, which means it's not the least, that means the 140-foot tower is not the least intrusive means. The record, as I read it, suggests that the difference between the 120-foot tower and the 140-foot tower is less visibly obtrusive than the 140-foot tower, which is not true. The decrease in the visual area was from 3.1% to 2.5%. And so that's, I mean, I can't say it's meaningless, but that's absolutely de minimis, isn't it? Well, it's a 20% reduction in the visible area, which I think to go from 3.1% of the total area being able to see it, from 3.1% down to 2.6% is a 20% reduction in that area that's visible to see it. No, and I think the district... Ninety-eight percent of the people are not bothered by it, so... So, and I think, you know, reasonable minds could disagree. I think this is why the district court properly recognized its role under the law as reviewing the PUC's decision to determine whether there was substantial evidence to support the conclusion that it was less visually obtrusive. That seems quite insubstantial evidence to me, going from 3% to 2%. It's their own evidence doesn't demonstrate that it's needed. I mean, I think this goes back to, if they said 250 feet is what we need, the least intrusive means test means what it says. It's got to be the least intrusive means. It gives this balance where you're carved out from local and state regulation of things like aesthetics and other environmental and land use impacts, but you only get that carve out to the extent that what you're proposing is the least that it can be. So, is that 20 feet gap, you know, going to be a huge difference to somebody? No. Would 150 feet? Would 160 feet? That's not the standard. The standard is, is it the least obtrusive visually? And the evidence provided by the applicant itself dictates, demonstrates that it's not. Let me ask you about the statutory language, the effective prohibition language, because it talks about the provision, effective prohibiting the provision of personal wireless services. Your adversary says that the case law is pretty uniform, that that's a provider-based, that signals a provider-based orientation, where the Congress wanted to encourage the provision of personal wireless services around the country. Our case, TCG versus, TCG New York versus White Plains, talked about how it focused on whether there's any inhibition of any competitor, potential competitor, to compete in a fair and balanced way, that this really speaks to carriers and their ability to come in. What's wrong with that approach? And is he correct that that's been the uniform understanding? I'm honestly not an expert in this area of the law, and I haven't done a thorough kind of review. I'm confident that I don't take issue with that point. And I don't think that it's necessarily incorrect. But I think you still have to demonstrate somehow that a carrier who has a service to provide to Northeastern Vermont would be prohibited from doing so. Well, if only two can get on this, I mean, they all have coverage gaps. But there's no coverage. I think no one's congested the coverage gap, right? But from a carrier perspective, there are coverage gaps. And so if only two can go on the 120-foot tower, why doesn't that effectively prohibit the other carriers from providing wireless service? There's no indication that they ever would want to. I mean, I think it's fundamentally true that if they build the 140-foot tower and only the actors who are active in Vermont presently, AT&T and Verizon, co-located on that 140-foot tower, that the tower would be 20 feet taller than it needed to be for those purposes. And I think that's sufficient. If down the road there's a different carrier wants to come in, as I said, then it would be evaluated at that time whether they may still be able to co-locate on the 120-foot tower, because there's nothing in their evidence rules that out. So this hypothetical concern about some other carrier, what if a fifth carrier comes or a sixth carrier comes onto the scene? Would then every potential tower built by anybody necessarily have to accommodate any potential person who plausibly, as the applicant defines it, may want access to that area? I think that turns the purpose of 332C7 on its head. By giving the applicant the one who gets to decide how they want to define what they're filling, provide a maximalist approach so that they're most plausibly going to have the most opportunity to lease as much space to make money, because that's really the business model that they articulate they have in their briefing, is to maximize that space. And so they're always going to want to go for the most, which is contrary to the preservation of local authority to regulate the impacts of this. So I want to be clear. There are currently two providers in this area. That's my understanding, correct. Suppose down the line a third provider might want to come in because people flood out of New York to move to that area. What would happen? I think it's hypothetical. There's a possibility they could co-locate on the 120-foot tower as it's constructed. There's a possibility that they could add on to the 120-foot tower the minimum that they needed to do to, maybe that's 5 feet, maybe that's 10 feet, to provide a service to fill their gap. If neither of those are possible, then they could construct their own facility somewhere else or at the same site. Again, this just goes to the purely hypothetical nature and speculative nature of the decision to include more than what's necessary to meet the fundamental purpose of the project, which is to provide their own service and to provide some opportunity for co-location for national personal wireless carriers. So would you, you said 140-foot tower is a no-go. Would you approve a 120-foot tower? I think there's certainly an indication from the Public Utility Commission that a 120-foot tower would be probably approved. Yeah, I think it's certainly more consistent with the regional plan because then I don't think, again, that I think is what the evidence shows to be the least intrusive way to meet the purposes of the project. Okay. All right. Thanks very much to both counsel. We will take the case under advice.